UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARY ANN GASCHO,

        Plaintiff,

                                        Case Number 08-10955-BC
v.                                         Honorable Thomas L. Ludington

SCHEURER HOSPITAL,

        Defendant.
_____ /

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING AMENDED COMPLAINT WITH PREJUDICE

On March 6, 2008, Plaintiff Mary Ann Gascho ("Plaintiff") filed a complaint against Defendant Scheurer Hospital ("Defendant" or "Hospital"). There, Plaintiff requested the rescission of a settlement agreement in which she waived claims against Defendant, who is her former employer, and advanced claims of sexual harassment or employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e et seq., and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 et seq., retaliation for exercise of her rights under Title VII and the ELCRA, and breach of contract.

On April 25, 2008, Defendant filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Defendant argued that Plaintiff had not tendered back the consideration received under a settlement agreement, as required under *Stefanac v. Cranbrook Educational Community*, 458 N.W.2d 56, 60 (Mich. 1990). On October 23, 2008, Plaintiff filed an amended complaint, pursuant to the Court's leave, which alleged that she had subsequently tendered the necessary amount into an escrow account. On November 7, 2008, Defendant filed a partial motion to dismiss, seeking dismissal of Plaintiff's state law claims, which required that Plaintiff tender back

the consideration that she received under the release before, or contemporaneous with, her filing of the original complaint. On January 14, 2009, the Court granted Defendant's motion to dismiss Plaintiff's state law claims, and Plaintiff now maintains claims under Title VII.

As the Court has previously recognized, before proceeding to the merits of Plaintiff's Title VII claims, the validity of the release signed by Plaintiff must be addressed. Now before the Court is Defendant's motion for summary judgment [Dkt. # 40], which contends that Plaintiff cannot establish that she signed the release under duress. Therefore, Defendant contends that the release is enforceable and Plaintiff cannot bring claims against Defendant under Title VII. Plaintiff filed a response [Dkt. # 44] on April 13, 2009, and Defendant filed a reply [Dkt. # 45] on April 27, 2009. Pursuant to the Court's request, the parties filed supplemental briefing [Dkt. # 47, 48] regarding the applicability of federal law to the validity of the release. For the reasons stated below, Defendant's motion for summary judgment will be granted.

I

Except where noted, the following facts are alleged in Plaintiff's amended complaint:

Plaintiff Mary Ann Gascho ("Plaintiff") worked as a registered nurse at Defendant Scheurer Hospital ("Defendant" or "Hospital") for approximately thirty-five years. Her then-husband, Dwight Gascho ("Gascho"), worked as Defendant's president and chief executive officer, and had been employed by the Hospital for approximately sixteen years. Plaintiff alleges that Gascho had an affair with Theresa Rabideau ("Rabideau"), an officer and vice president of Defendant, during their marriage and while Plaintiff was employed by Defendant. Plaintiff states that she became aware of the affair in October or November 2006, and that the affair took place on company time and premises, including on business trips. Plaintiff maintains that Gascho revealed the affair to her on

November 11, 2006.

Plaintiff claims that she asked Gascho to cease the offensive conduct, and that she discussed the situation with her immediate supervisor, Lee Gascho ("Plaintiff's supervisor"). Lee Gascho is a cousin of Dwight Gascho. On November 15, 2006, Plaintiff allegedly confronted Rabideau in front of the human resources manager, Greg Foy ("Foy"). According to Plaintiff, she then met with Rabideau in Rabideau's office and at Rabideau's request. Rabdieau allegedly confessed to the affair and indicated that she would leave her position of employment at Defendant.

At her deposition, Plaintiff testified that in November 2006, Gascho engaged in two acts of violence against her. First, Gascho "mule kicked [her] in bed" because she was "snoring like a cow." Second, Plaintiff testified that on November 10, 2006, Gascho raped her after she said "no" to his advances, which also resulted in a broken lip. Plaintiff agreed that she was intimidated by Gascho and fearful of him during this time period.

On December 4, 2006, Plaintiff claims that she took off from work, due to work stress caused by the affair and the fact that Rabideau continued to work for Defendant. Plaintiff returned to work on December 11, 2006, but left again on December 13, 2006. On January 8, 2007, Plaintiff again returned to work. On January 16, 2007, Gascho allegedly confronted Plaintiff about discussing the affair with their friends. Plaintiff asserts that Gascho informed her that she could not walk through the hospital without an escort.

On January 17, 2007, Plaintiff maintains that Gascho stated that he was seeking a divorce. Plaintiff claims that she discussed the matter with Rabideau. During that discussion, Plaintiff alleges that Gascho entered Rabideau's office, barred the door, physically assaulted Plaintiff, and dragged her across the hallway. Gascho allegedly announced that Plaintiff was fired. Plaintiff states that

Gascho left, collected boxes, and directed Plaintiff to take her belongings and leave. Next, Foy and Plaintiff's supervisor allegedly intervened, stating that they would handle the situation, and that they would communicate with Plaintiff in the morning after consulting with an attorney.

On January 19, 2007, Plaintiff maintains that she met with her supervisor and Foy, and that she showed them welts and contusions on her neck, shoulder, and arms. Plaintiff states that she accused Foy and her supervisor of protecting Gascho and that she informed them of the difficulty she had separating the work environment from the difficulty in her personal life. Ultimately, Plaintiff received a three-day suspension as a result of the occurrence, and was warned that her employment would be terminated if similar, improper conduct occurred again. On or about the date of the occurrence, Plaintiff began a leave of absence pursuant to the Family and Medical Leave Act.

In about February 2007, Gascho notified Plaintiff that she would be presented with an employment separation agreement. Subsequently, Foy and Lee Gascho presented the document to Plaintiff at her home. Foy testified that he knew that Plaintiff was under a great deal of stress at the time. He also testified that Plaintiff was nervous and distraught and that Plaintiff was crying. He testified that Plaintiff had bruises, which he was aware that she had received from Gascho. Lee Gascho was also aware of Plaintiff's injuries, that she was on medication, that she had lost a significant amount of weight, and that she was afraid of Gascho, who lived in an adjacent apartment. Foy testified that he advised Plaintiff that she should have the document reviewed by a labor attorney. He also explained that she had twenty-one days to consider the agreement and seven days to revoke the agreement after signing it.

Plaintiff testified that she spoke to each of her three children about the agreement before signing it; each recommended that she sign it. Plaintiff also testified that she presented the

agreement to her divorce attorney to review, but that the attorney declined to review it because she was not familiar with labor documents.

Plaintiff maintains that Gascho later demanded that she sign the document. Plaintiff claims that Gascho issued several threats in conversations with her, including that he would "be the worst enemy you could ever imagine, the hospital has deep pockets and we always win," that she would have nothing if he lost his job, that she could at least have an income and insurance, that it was only a "retirement package and we do it all the time," that he would "destroy her life," that he would disclose to the public the "board members and their affairs," that he was "willing to ruin other people's lives" if he lost his job, and he said "God damn it, I am in control!" Plaintiff also claims that Gascho intimated that he would end the affair with Rabideau and that he might reconcile with Plaintiff if she signed the document. Plaintiff further maintains that Gascho knew that she was taking anti-depressant medications that could affect her judgment at that time. Gascho testified that Plaintiff could not function at work, but that she could function at home.

On or about February 28, 2007, Plaintiff executed the agreement, which was also signed by Defendant's chief financial officer, Terry Lutz. [Dkt. # 26, pp. 25-30]. Gascho was at Plaintiff's home when she signed the agreement. She testified that she called him and informed him that she was ready to sign the agreement. Plaintiff testified that the meeting was civil and that Gascho did not threaten her during the meeting. Plaintiff testified that between January 17, 2007 and February 28, 2007, there were no incidents of physical abuse or physical threats.

The agreement provides that Plaintiff will continue to receive her salary for a year, and that Defendant will reimburse Plaintiff for COBRA[1] premium payments for eighteen months. Defendant

---

[1] Consolidated Omnibus Budget Reconciliation Act (COBRA), 29 U.S.C. § 1161 et seq.

approximates the total value of the consideration at $70,000. In exchange, Plaintiff agreed to release any and all claims that she might have against Defendant and its employees, including claims under Title VII and the ELCRA. On March 1, 2007, Plaintiff was diagnosed as having "major depression" and "limited coping skills."

On October 17, 2007, Plaintiff and Gascho entered into a consent judgment of divorce.

II

Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A fact is "material" if its resolution affects the outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record which demonstrate the

absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The party who bears the burden of proof must present a jury question as to each element of the claim, *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000), rather than raise only "metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

### III

As the Court's prior orders have indicated, "[f]ederal law controls the validity of a release of a federal cause of action." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1481 (6th Cir. 1989). Initially, in its motion for summary judgment, Defendant assumed, without providing legal authority, that Michigan law governs the issue of whether Plaintiff signed the release at issue under duress. In its supplemental briefing, Defendant expressly advances the argument that Michigan law applies. Defendant emphasizes that the Sixth Circuit applies "ordinary contract principles," in determining whether a Title VII waiver is valid, quoting *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir.

1995). Defendant contends that the phrase "ordinary contract principles" necessarily refers to state-law.

To support this proposition, Defendant relies on a Seventh Circuit case, *Pierce v. Atchison, Topeka and Santa Fe Railway Co.*, 65 F.3d 562 (7th Cir. 1995). In *Pierce*, the Seventh Circuit noted that "[c]ourts disagree as to the appropriate source of law to be used in determining whether a release of federal civil rights is knowing and voluntary." 65 F.3d at 570. The court explained that the Second, Third, Fifth, Tenth and Eleventh Circuits utilize a "federal 'totality of the circumstances' approach in determining whether a plaintiff knowingly and voluntarily executed a release of claims." *Id.* According to the Seventh Circuit, this approach "requires a detailed look at the circumstances surrounding execution of the release in addition to, rather than as a replacement for, ordinary contract considerations." *Id.* In contrast, the *Pierce* court stated that the Fourth, Sixth, and Eighth Circuits utilize "general principles of contract construction," meaning that the inquiry ends once the court "determine[s] that the release passes state contract law muster." *Id.*

To categorize the Sixth Circuit as applying state contract law, the Seventh Circuit cited *Runyan v. National Cash Register Corp.*, 787 F.2d 1039 (6th Cir. 1986). In *Runyan*, the Sixth Circuit generally stated, "In determining whether plaintiff knowingly and voluntarily waived his ADEA claims, we apply ordinary contract principles." 787 F.2d at 1044 n.10. Notably, however, the Sixth Circuit has decided at least two more significant cases since the Seventh Circuit decided *Pierce*.

In *Adams*, the Sixth Circuit stated that it applies "ordinary contract principles" in determining whether a release of Title VII claims is valid. 67 F.3d at 583. Despite that statement, however, the Sixth Circuit did not turn to state law, but evaluated whether a release was "knowingly and

-8-

voluntarily executed" by looking to "(1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances." *Id.*

More recently, in *Nicklin v. Henderson*, the Sixth Circuit relied on the same five factors acknowledged in *Adams*, and stated, "For discrimination cases, the Sixth Circuit uses a balancing test to determine whether a settlement agreement was entered into knowingly and voluntarily." 352 F.3d at 1080. The court also analyzed whether the release could be invalidated based on mistake or fraud. *Id.* at 1081 (citing *Brown v. County of Genesee*, 872 F.2d 169, 174 (6th Cir. 1989) ("Existing precedent . . . dictates that only the existence of fraud or mutual mistake can justify reopening an otherwise valid settlement agreement.")). *See also Callen v. Penn. R.R. Co.*, 332 U.S. 625, 630 (1948) (addressing whether fraud or mutual mistake invalidated the plaintiff's release of his Federal Employers' Liability Act cause of action).

In light of *Adams* and *Nicklin*, the *Pierce* court's characterization of Sixth Circuit jurisprudence cannot be considered complete. Thus, Defendant's reliance on *Pierce* is misplaced. Defendant also relies on *Clark v. Riverview Fire Protection District*, 354 F.3d 752 (8th Cir. 2004), in which the Eighth Circuit applied Missouri law to the plaintiff's claim that the release of his Title VII claims was invalid because of duress. The Eighth Circuit noted, however, that the plaintiff did not challenge the application of Missouri law to the duress issue. *Clark*, 354 F.3d at 755 n.3. While the Eighth Circuit may apply state law to determine the validity of a release of federal claims, this approach appears to conflict with Sixth Circuit precedent, which is binding on this Court.

Because the Court is bound by *Adams* and *Nicklin*, the Court will address the following five

factors: "(1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances." *Adams*, 67 F.3d at 583.

Plaintiff contends that the "first and fifth factors are primarily at issue in the present case." Plaintiff emphasizes the significance of Gascho's influence on Plaintiff because of their marital relationship. Plaintiff emphasizes that Gascho's role as president and chief executive officer of the Hospital became blurred with his role as Plaintiff's husband on the day that Plaintiff signed the release. Plaintiff contends that Gascho knew that it was not clear to Plaintiff which role he was filling that day and that Gascho was aware of the mental and emotional issues that Plaintiff was then experiencing.

Additionally, Plaintiff emphasizes that Gascho subjected Plaintiff to physical and verbal abuse in Plaintiff's home and at the Hospital prior to the time that Plaintiff signed the release. Plaintiff emphasizes that Gascho threatened Plaintiff with financial ruin and stated to her that he would lose his job as the primary wage earner for Plaintiff's family. Plaintiff contends that Gascho downplayed the significance of the release.

Despite Plaintiff's emphasis on the first and fifth factors, Defendant highlights facts relevant to the remaining factors. Defendant highlights the fact that Plaintiff does not contend that she was unable to understand the release due to her background or education, Plaintiff does not challenge the clarity of the agreement, Plaintiff received approximately $70,000 in consideration under the release, Plaintiff was advised to consult an attorney, and Plaintiff was allowed twenty-one days to consider the release.

Additionally, Defendant emphasizes that under the Restatement of Contracts 2d, § 175 (comment b), "[a] threat, even if improper, does not amount to duress if the victim has a reasonable alternative to succumbing and fails to take advantage of it." Defendant emphasizes that Plaintiff acknowledged that she knew her options were to either sign the release or sue. In fact, Plaintiff testified that when her supervisor and Foy came to her house to present her with the release, Foy told her, "you sue him for everything he's worth." Plaintiff further testified, "I felt like I had two choices, sign the paper or sue. The choice of doing nothing never was brought up."

Defendant emphasizes that while Plaintiff may have been emotionally distraught and taking antidepressant medications, there were no instances of physical abuse or physical threats in the month prior to Plaintiff signing the release. Ultimately, when Plaintiff made the decision to sign the release, she initiated contact with Gascho and asked him to come to her home.

Considering all of the facts presented by Plaintiff as true, and considering all of the factors acknowledged in *Adams*, the release is valid as to Plaintiff's Title VII claims. Moreover, even if a release must also be valid under Michigan law related to duress, Plaintiff cannot show that the release is invalid. Under Michigan law, "[d]uress exists when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will." *Hackley v. Headly*, 8 N.W. 511, 512-13 (Mich. 1881)). "Fear of financial ruin alone is insufficient to establish economic duress; it must also be established that the person applying the coercion acted unlawfully." *Farm Credit Servs. of Mich.'s Heartland, PCA, v Weldon*, 591 N.W.2d 438, 447 (Mich. Ct. App. 1998) (internal quotation omitted). Even viewing all of the facts alleged by Plaintiff as true, Plaintiff cannot establish that Defendant acted unlawfully.

-11-

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [Dkt. # 40] is **GRANTED**.

It is further **ORDERED** that the amended complaint [Dkt. # 26] is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: July 23, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 23, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS

---